**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **RAMONA L. SOPKO,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 12 C 6240** |
| **v.** ) | |
| ) | **Magistrate Judge Michael T. Mason** |
| **CAROLYN W. COLVIN, Acting** ) | |
| **Commissioner of Social Security,**[1] ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Plaintiff Ramona L. Sopko ("Sopko" or "claimant") brings this motion for summary judgment [13] seeking judicial review of the final decision of the Commissioner of Social Security (the "Commissioner"). The Commissioner denied Sopko's claim for disability insurance benefits ("DIB") under the Social Security Act (the "Act"), 42 U.S.C. §§ 416(i) and 423(d). The Commissioner has filed a cross-motion for summary judgment [19] asking this Court to uphold the decision of the Administrative Law Judge (the "ALJ"). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, claimant's motion for summary judgment is granted in part and denied in part, and the Commissioner's cross-motion for summary judgment is denied. This case is remanded for further proceedings consistent with this Opinion.

## I.      BACKGROUND

### A.      Procedural History

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Commissioner Michael J. Astrue as defendant in this suit.

Sopko filed her application for DIB on October 19, 2009.[2] (R. 172-75.) Sopko alleges that she has been disabled since September 11, 2009 due to seizures, stroke, enlarged liver, Addison's disease, and urinary incontinence. (R. 125.) Sopko's date last insured is December 31, 2014. (R. 180.) Sopko's claim was denied initially on February 11, 2010, and again on June 3, 2010 after a timely request for reconsideration. (R. 109-13, 117, 122-25.) Sopko filed a timely request for a hearing, which was held before ALJ Curt Marceille on May 25, 2011. (R. 75-103.) In addition to testimony from claimant, the ALJ heard testimony from a vocational expert.

The ALJ issued a decision denying Sopko's claim for benefits on June 9, 2011. (R. 21-34.) Sopko then filed a timely request for review. (R. 20.) The Appeals Council denied Sopko's request for review on June 29, 2012, at which time the ALJ's decision became the final decision of the Commissioner. (R. 1-6.) Sopko subsequently filed this action and the parties consented to the jurisdiction of this Court pursuant to 28 U.S.C. § 636(c) [7].

**B.    Medical Evidence**

**1.    Treating Physicians**

The record reveals that Sopko may have suffered a mini-stroke in February 2009, resulting in left-sided weakness, for which she underwent physical therapy.[3] (R. 293, 362.) She suffered a similar episode in mid-September 2009, when she was

---

[2] It appears that Sopko may have contemplated filing a claim for Supplemental Security Income ("SSI"). However, on October 19, 2009, the Social Security Administration deemed her informally ineligible for SSI based on her monthly income. (R. 106-08.)

[3] Throughout the record, claimant's stroke-like incidents are also referred to as cerebral vascular episodes ("CVA") and transient ischemic attacks ("TIA"). The record is not entirely clear as to which specific type of episode she suffered on which date.

hospitalized at Provena St. Joseph Medical Center ("St. Joseph") and complained of lower and upper extremity weakness, dizziness, left-sided facial droop, and headaches. (R. 338, 348.)  An echocardiogram during her hospitalization showed an atrial septal aneurysm, but an MRI and CT of the brain revealed unremarkable results.  (R. 329, 338, 348.)

Following Sopko's episode in September 2009, Dr. R.W. Schubert, Sopko's primary care physician, referred her to neuropsychologist Michael Gelbort.  (R. 353.) Sopko reported that she suffers anxiety attacks, which gave rise to a variety of physical symptoms.  (*Id.*)  Sopko explained that she "fired" one of her doctors and intended to "fire" another because they say there is nothing wrong with her.  (R. 354.)  She described a history of migraines, but had not had one in the past three years.  (*Id.*) Though she has never had a seizure, she said her doctors warned her against driving following her most recent episode.  (*Id.*)  She acknowledged having received psychological treatment in the past for an eating disorder.  (*Id.*)  She explained to Dr. Gelbort that she often feels edgy, irritable, stressed, and depressed.  (*Id.*)

Upon testing by Dr. Gelbort, Sopko earned a verbal IQ of 70, which is on the cusp between borderline deficient and mildly impaired, a performance IQ of 79, which is on the cusp between low average and borderline deficient, and a full scale IQ of 72, which is at the lower end of the borderline deficient range of functioning.  (R. 355.)  Dr. Gelbort also found deficiencies in Sopko's vocabulary skills, and verbal attention and concentration, among other things.  (*Id.*)

In addition, Sopko was observed as strongly right-side dominant with fine motor speed and dexterity in the low average range on the right, and in the borderline deficient

range on the left side.  (R. 355.)  In his assessment, Dr. Gelbort stated that Sopko's "clinical scales which were significantly elevated…measure a tendency to take emotional upset and convert it into complaints of physical problem[s]."  (R. 356.)  Dr. Gelbort reported that Sopko does not respond well to doctors who have suggested that her symptoms are more functional than organic, and concluded that it would be beneficial to focus on improving her treatment for depression.  (*Id.*)

A few weeks later, Sopko was admitted to St. Joseph again complaining of dizziness and left-sided weakness, as well as incidents of low blood pressure.  (R. 293.) On September 30, 2009, claimant saw Dr. Ramesh Patel for these symptoms.  (R. 293-96.)  Dr. Patel noted a history of degenerative disc disease, headaches, fibromyalgia, anxiety, and left foot drop with knee pain.  (R. 294.)  Dr. Patel's examination revealed "definite weakness in the left upper and lower extremities."  (*Id.*)  Among other things, Dr. Patel assessed a "cerebrovascular accident that was sustained in February of 2008 with recurrence about two weeks ago."  (R. 296.)  The MRI and CT scan of the brain were normal, as was the chest x-ray.  (R. 324, 327-28.)

On October 10, 2009, Dr. Patel performed a tilt table study.  (R. 290-91.)  Initially, the study was negative for induction of neurocirculatory insufficiency.  (R. 291.) However, following the introduction of nitroglycerin, claimant's heart rate and blood pressure dropped and she lost consciousness.  (*Id.*)  Dr. Patel recommended that Sopko maintain good hydration, avoid extremes in temperature, and join an exercise program.  (*Id.*)  He also advised claimant to take her medications with something in her stomach, and not to take them all at one time.  (*Id.*)

Sopko returned to see Dr. Patel on October 28, 2009.  (R. 411.)  Sopko reported

feeling reasonably well following her discharge from the hospital. (*Id.*) She still suffered from left-sided weakness, had fallen a few times, and was using a walker. (*Id.*) She denied chest pain, dizziness, or palpitations. (*Id.*) A physical examination was unremarkable. (*Id.*) On November 3, 2009, Sopko saw Dr. Schubert. (R. 307.) Dr. Schubert noted a history of two CVAs and hypotension. (*Id.*) Sopko reported that she was attending physical therapy two times a week for two hours each day and that overall she was "coming along better." (*Id.*)

On January 15, 2010, Sopko returned to the emergency room at St. Joseph complaining of weakness and fatigue, as well as gastrointestinal issues. (R. 436.) She reported she had fainted the previous day. (*Id.*) Sopko was discharged in stable condition and advised to follow up with her personal physician. (R. 437.)

Sopko continued to complain of low blood pressure and episodes of dizziness at her February 3, 2010 appointment with Dr. Schubert. (R. 373.) The following day, Sopko saw Dr. Patel and reported multiple TIA episodes, which she described as "seizure like," and which were accompanied by confusion and disorientation. (R. 410.) During this visit with Dr. Patel, Sopko experienced a period of low blood pressure, during which she felt like she was going to pass out. (*Id.*)

On February 18, 2010, Sopko consulted with neurologist Dr. Mary Monaco regarding her episodes of loss of consciousness. (R. 388.) Dr. Monaco noted a diminished sensation of the left arm and leg and that Sopko ambulates with a cane. (*Id.*) She prescribed Florinef for hypotension and ordered an MRI of the brain, as well as an ambulatory EEG. (*Id.*) The results of those tests were normal. (R. 391, 394.) On March 25, 2010, Sopko began wearing a cardiac event monitor for a thirty day

recording. (R. 418-21.) That test yielded heart rate variations within normal range, despite Sopko's notations of lightheadedness, dizziness, and palpitations. (*Id.*)

In a general letter dated April 9, 2010, Dr. Schubert stated that Sopko, who had been his patient since November 2007, suffered from hypotension, syncopal episodes, which occur even when seated, and was being evaluated for seizure symptoms. (R. 430.) He explained that Sopko is not allowed to drive and described her history of TIA/CVA incidents with resultant paresthesias of her left arm, leg, and foot. (*Id.*) He stated that Sopko uses a walker or a wheelchair and has been unable to work since September 13, 2009. (*Id.*)

On April 14, 2010, claimant presented to the emergency room at Silver Cross Hospital complaining of left-sided facial droop and weakness accompanied by a migraine headache. (R. 397.) A CT scan of the brain, chest x-ray, and ECG were normal. (R. 404-06) The examining physician assessed a possible CVA and Sopko was transferred to St. Joseph, where she saw Dr. Monaco for a neurology consultation. (R. 398, 401.) Dr. Monaco observed a diminished sensation on the left side of Sopko's face and in her left extremities. (R. 390.) The MRI of the brain was unremarkable. (R. 392.) Dr. Monaco did not recommend any further stroke work-up because Sopko had undergone multiple evaluations in the past with no evidence of an acute stroke. (*Id.*)

Also on April 14, 2010, Sopko saw Dr. Wajid Khan for an examination regarding her history of mood disorder. (R. 514-15.) Claimant reported a history of an eating disorder, but denied any current symptoms of depression, sadness, irritable mood, or hopelessness. (R. 514.) She explained that Zoloft helps her anxiety and she had not been having panic attacks. (*Id.*) Dr. Khan recommended an increase in Sopko's Zoloft

dosage and that she see a psychiatrist and therapist. (R. 515.) Sopko was discharged

from St. Joseph on April 16, 2010 and advised to "follow-up at a university setting for a

possible TIA." (R. 521.)

At an appointment with Dr. Patel on April 19, 2010, Sopko was feeling

reasonably well and denied chest pain, dizziness, or palpitations. (R. 409.) A June 7,

2010 MRI of the cervical spine showed a mild degree of degenerative disc disease. (R.

463.) On June 19, 2010, Sopko complained of back problems to Dr. Patel. (R. 490.)

An unsigned record dated June 21, 2010 reveals Sopko was seen at the Joliet

Headache and Neuro Center for a history of migraine headaches. (R. 533.) At this

time, Sokpo was advised to continue taking Topamax for prevention of headaches. (*Id.*)

Claimant saw Dr. Elsy Devassy on July 21, 2010 for a psychiatric evaluation. (R.

580-84.) She complained of marital problems, depressed mood, and anxiety. (R. 580.)

Dr. Devassy observed a depressed mood and affect. (R. 583.) She assessed major

depression and panic disorder. (*Id.*) She recommended that claimant continue to take

Klonopin and Xanax, and increased her dosage of Zoloft. (R. 584.) Dr. Devassy saw

claimant on several occasions throughout the following year and Sopko continued to

voice similar complaints. (R. 585-89.)

In October 2010, two skin cancer lesions were removed from claimant's right arm

and foot. (R. 568.) On November 17, 2010, Sopko told Dr. Patel that she wanted a

breast reduction to reduce her back pain. (R. 489.) Sopko saw Dr. Schubert on

December 7, 2010 and complained of severe fibromyalgia pain, which caused her to

stay in bed three to four days a week. (R. 603.) She had difficulty walking. (*Id.*) In a

letter dated December 8, 2010, Dr. Schubert wrote that Sopko needed a breast

reduction in order to reduce her pain and to allow her improved ability to perform activities of daily living.  (R. 473.)  In a separate letter, dated that same day, Dr. Schubert wrote that Sopko is "permanently disabled and is unable to be gainfully employed in any capacity."  (R. 474.)

On February 21, 2011, Sopko saw Dr. Schubert for fibromyalgia follow-up and stated that Nucynta was "working pretty well."  (R. 601.)  Sopko also underwent a lower extremity venous duplex scan for her history of pain and edema.  (R. 502.)  The scan "showed no evidence of deep venous thrombosis or venous occlusion involving the venous segments visualized."  (*Id.*)  An x-ray showed no fracture, dislocation, or bony abnormality in the right ankle.  (R. 613.)

In March 2011, Sopko fell and injured her wrists, right shoulder, and tail bone. (R. 591.)  She saw Dr. Jerry Bertolini, who noted tenderness at the injury sites and a decreased range of motion in the right shoulder.  (*Id.*)  X-rays were negative for fracture. (*Id.*)  Dr. Bertolini recommended physical therapy, advised her to do exercises at home, and prescribed pain medication.  (*Id.*)  At a follow-up appointment on April 1, 2011, Sopko continued to suffer from right shoulder pain and a decreased range of motion despite undergoing physical therapy.  (R. 592.)  An MRI showed evidence of a partial tear or tendonosis of the supraspinatus and infraspinatus, but no complete tear.  (R. 593.)  Subacromial bursitis and effusion were also seen in the shoulder.  (*Id.*)  Dr. Bertolini gave Sopko a cortisone shot to ease her pain during therapy sessions "since she was making very little progress."  (*Id.*)  Her pain continued despite the cortisone shot.  (R. 594.)  Dr. Bertolini continued to advise therapy and prescribe pain medication. (*Id.*)  Dr. Bertolini also prescribed a transcutaneous electrical nerve stimulation ("TENS")

unit.  (R. 595.)

On March 11, 2011, Sopko saw Dr. Suresh Bhalla and complained of increasing stomach pain for the last two months and difficulty swallowing.  (R. 616.)  Dr. Bhalla assessed gastroesophageal reflux disease, peptic ulcer disease, and dysphagia.  (*Id.*)  A subsequent upper endoscopy revealed Schatzki's ring and gastritis.  (R. 618.)

Sopko returned to St. Joseph on March 25, 2011 complaining of decreased range of motion in her head and neck.  (R. 788.)  An MRI of the brain revealed no unusual results.  (R. 607.)  An MRI of the cervical spine again showed mild degenerative changes.  (R. 608-09.)

The records reveal that Sopko underwent a great deal of physical and occupational therapy for the pain and weakness she suffered following her stroke incidents.  (R. 623-68, 670-734.)  In an evaluation dated December 1, 2009, the physical therapist noted that claimant had "made great improvement in strength and endurance of bilateral lower extremities.  Patient is able to ambulate with a single point cane for community distances and without assistive device for homebound distances."  (R. 718.)  Sopko continued to attend physical therapy sessions, and in a progress note dated April 5, 2010, she could "ambulate independently with no major gait deviations noted", and with no need for a break during the exercises.  (R. 623.)

## 2.    State Agency Consultants

On December 26, 2009, Dr. Muhammad Rafiq conducted an internal medicine consultative examination.  (R. 362-65.)  Claimant described a history of strokes, petit mal epilepsy, and hepatomegaly, with an unknown origin.  (R. 362.)  Claimant complained that her left arm and leg were weak as a result of her stroke, and that she

9

was unable to lift objects more than two pounds with her left hand. (R. 362-63.)

Claimant also reported that she gets headaches and dizzy spells off and on, and cannot focus or concentrate. (R. 362.) She said she does not drive for fear of suffering a seizure. (*Id.*) According to claimant, she could walk for ten steps with a cane, stand for five minutes, and sit normally, but is unable to climb stairs. (R. 363.) She stated that she prepares sandwiches or microwave meals, and can dress and bathe with the help of her husband. (*Id.*)

Upon physical examination, Dr. Rafiq noted that claimant could get on and off the exam table with moderate difficulty. (R. 364.) She could walk without assistive devices for more than fifty feet, but her gait was slow and antalgic. (*Id.*) She was unable to heel-to-toe walk, stand or walk on her toes or heels, stand or hop on the left leg, or squat. (*Id.*) Power was 5/5 in all limbs except in her left leg and left foot where it was reduced to 4/5. (*Id.*) Claimant's grip strength was normal in her right hand and mildly reduced in her left hand. (*Id.*) She was able to grasp and manipulate objects without difficulty. (*Id.*) Straight leg test was positive on the right side. (*Id.*) Her range of motion was otherwise normal. (*Id.*) Dr. Rafiq saw no signs of depression, agitation, irritability, or anxiety. (*Id.*)

On February 8, 2010, Dr. Lenore Gonzalez completed a physical Residual Function Capacity ("RFC") Assessment. (R. 376-83.) Dr. Gonzalez concluded that Sopko could occasionally lift and/or carry twenty pounds; could frequently lift and/or carry ten pounds; could stand and/or walk for at least two hours in an eight-hour workday; and could sit for six hours in an eight-hour workday. (R. 377.) Dr. Gonzalez noted that claimant was unlimited in her pushing and pulling abilities, apart from her

limitations in lifting and carrying.  (*Id.*)  Dr. Gonzalez supported her findings regarding claimant's exertional limitations with the results of the examination performed by Dr. Rafiq.  (R. 377-78.)

Further, Dr. Gonzalez found that Sopko could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl, but could never climb ladders, ropes, or scaffolds.  (R. 378.)  Dr. Gonzalez found no other manipulative, visual, or communicative limitations.  (R. 379-80.)  Dr. Gonzalez did find that Sopko should avoid concentrated exposure to hazards such as machinery or heights.  (R. 380.)  On the whole, Dr. Gonzalez found Sopko's statements regarding symptoms to be partially credible, but that those statements exceed that supported by the objective medical findings.  (R. 383.)  On June 2, 2010, Dr. Francis affirmed Dr. Gonzalez's RFC assessment.  (R. 459-61.)

Dr. Laura Rosch completed a "Medical Source Statement of Ability to do Work-Related Activities" on January 11, 2011.  (R. 477-86.)  She concluded that Sopko could lift and carry up to ten pounds frequently, meaning from one-third to two-thirds of the time.  (R. 477.)  Dr. Rosch reported that claimant could, without interruption, sit for two hours at a time, and stand or walk for fifteen minutes at a time.  (R. 478.)  She found that during the span of an eight-hour workday, claimant could sit for six hours, and walk and stand for one hour.  (*Id.*)  Dr. Rosch also indicated that the use of a cane is medically necessary for Sopko to ambulate, and that she could lift or carry small objects with her unused arm.  (*Id.*)  Dr. Rosch reported that claimant could reach, handle, finger, feel, push, and pull with both hands continuously, and could frequently use both feet to operate foot controls.  (*Id.*)

11

Dr. Rosch also assessed claimant's postural limitations and concluded that she could occasionally climb stairs and ramps, balance, stoop, kneel, crouch and crawl, but could never climb ladders or scaffolds. (R. 480.) She also concluded that claimant should avoid unprotected heights and operating a vehicle. (R. 481.) In Dr. Rosch's opinion, claimant could perform basic daily activities such as preparing meals and bathing. (R. 482.)

### C.    Claimant's Testimony

Sopko appeared with counsel before the ALJ on May 25, 2011 and testified as follows. At the time of the hearing, Sopko was six months and eight days away from her fiftieth birthday. (R. 78.) Sopko stopped working in early September 2009 after suffering a small stroke that caused her to lose all strength in her left side. (R. 79.) She suffered another stroke two weeks later. (*Id.*) Sopko explained that her physicians called her stroke "a complex migraine seizure," but also said it was a "small TIA." (*Id.*) After she stopped working, Sopko collected unemployment despite her claims that she is unable to work. (R. 80-81.)

Sopko testified that she suffers from fibromyalgia and takes Nucynta for the pain, which she rated a nine on a ten-point scale. (R. 79, 97.) Her primary doctor, Dr. Schubert, diagnosed her with fibromyalgia about four years ago. (R. 88.) Sopko has not seen or been referred to a rheumatologist, despite her doctor's diagnosis. (R. 87.) She testified that she has about ten tender points, which constantly ache and require a heating pad. (R. 91.)

According to claimant, she suffers from migraine headaches once or twice a week, and rated their severity an eight out of ten. (R. 84, 96.) During a migraine, which

12

can last several days, Sopko stays in bed with the lights off.  (R. 96.)  She takes

Topamax for her migraines and to prevent seizures.  (R. 84.)  Sopko testified that she

used to see Dr. Savietta for migraines, but changed neurologists because "he wouldn't

do nothing except throw medicine at me."  (R. 89.)

Claimant testified that her left side is weak, and "feels like it wants to give out all

the time."  (R. 93-94.)  Both of her hands are weak, but "she doesn't even mess with"

the left hand.  (R. 93.)  She cannot lift anything heavier than a glass.  (*Id.*)  She has

problems sitting down due to her left-sided weakness and back pain and can only sit for

fifteen to thirty minutes.  (R. 93, 95.)  Sokpo can stand on her own for only fifteen

minutes.  (R. 94, 99.)  She uses a cane or a walker to ambulate, and has done so since

2009.  (R. 82, 95.)  Sopko attended the hearing in a wheelchair, and testified that she

uses it when her legs are weak or when she goes to the mall.  (R. 79.)  She has not

been able to drive since her episodes in September 2009.  (R. 80.)

According to claimant, she had cancer removed from her right arm, and a

squamous carcinoma from her left foot.  (R. 82.)  She also stated that she has

undergone a lumpectomy on one of her breasts and is awaiting a breast reduction to

ease her back pain.  (*Id.*)  Claimant fell about two months prior to the hearing and

sustained an injury to her right shoulder, which required physical therapy and may

require surgery.  (R. 80.)

Claimant also suffers from Addison's disease that causes episodes of low blood

pressure and fainting spells.  (R. 84.)  She takes Florinef to help prevent fainting, in

addition to drinking a lot of water and Gatorade.  (R. 85.)

Sopko also suffers from anxiety and panic attacks about once or twice a week.

(R. 80, 100.)  She takes Zoloft and Klonopin for her depression and anxiety.  (R. 92.)
Claimant also sees her psychiatrist Dr. Devassy for her anxiety once or twice a month.
(*Id.*)  Her anxiety makes it difficult to sleep.  (R. 92-93.)

Claimant testified that she has good days and bad days, and spends much of her
time on the couch with a heating pad because of her medications and impairments.  (R.
83.)  She has to sit in a shower chair to bathe and needs help getting in and out of the
shower, and getting dressed.  (R. 80, 99.)  She takes naps every day.  (R. 97.)  In
addition, her husband takes care of all of the household chores because she can no
longer do so.  (R. 99.)  Sopko attends physical therapy two or three times a week, and
is "usually wiped out after that."  (R. 83.)  She also stated that her doctor told her to be
active and exercise, so she tries to do home exercises.  (R. 86.)  On the days she does
not go to therapy, Sopko watches TV, talks on the phone, and sometimes goes out to
lunch with friends or her mother.  (R. 87.)  She enjoys playing with her grandchildren,
but her impairments inhibit her ability to do so.  (R. 80.)

### D.  Vocational Expert's Testimony

Vocational Expert ("VE") Stephen Sprauer also offered testimony at the hearing.
The VE first classified claimant's past work as a bartender as semi-skilled, light work.
(R. 101.)  He classified her work as a retail manager as skilled, light work.  (*Id.*)

The ALJ then asked the VE to consider a hypothetical individual of the claimant's
age, education, and past work experience, who can perform sedentary work as defined
by the regulations, has continuous use of the hands, can occasionally reach over head

with the right hand, and can occasionally balance, stoop, kneel, crouch, and crawl.[4]  (R.

102.)  The hypothetical individual requires a cane for walking, cannot climb ladders,

ropes, or scaffolds, and cannot drive or be exposed to unprotected heights, dangerous

moving machinery, or extreme temperatures.  (*Id.*)  Additionally, the ALJ limited the

hypothetical individual to only occasional interaction with others, and to simple, routine,

and repetitive work involving only occasional decision-making and workplace changes.

(*Id.*)

    The VE testified that the hypothetical individual could not perform claimant's past

work.  (R. 102.)  When asked if any other jobs were available to such an individual, the

VE responded "very limited" and testified that he "would limit it to bench hand

assembly," which is unskilled, sedentary work, of which there are roughly 28,000 jobs

available.  (*Id.*)  He further explained that there are "not very many" jobs that fit within

the category of bench hand assembly.  (*Id.*)

## II.    LEGAL ANALYSIS

### A.    Standard of Review

    This Court must affirm the ALJ's decision if it is supported by substantial

evidence and free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d

936, 940 (7th Cir. 2002).  Substantial evidence is "more than a mere scintilla of proof."

---

[4] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R § 404.1567(a).

*Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001). It means "evidence a reasonable person would accept as adequate to support the decision." *Murphy v. Astrue*, 496 F.3d 630, 633 (7th Cir. 2007); *see also Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995). In determining whether there is substantial evidence, the Court reviews the entire record. *Kepple*, 268 F.3d at 516. However, our review is deferential. *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). We will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*quoting Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

Nonetheless, if, after a "critical review of the evidence," the ALJ's decision "lacks evidentiary support or an adequate discussion of the issues," this Court will not affirm it. *Lopez*, 336 F.3d at 539. While the ALJ need not discuss every piece of evidence in the record, he "must build an accurate and logical bridge from the evidence to [his] conclusion." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Further, the ALJ "may not select and discuss only that evidence that favors his ultimate conclusion," *Diaz*, 55 F.3d at 308, but "must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). Ultimately, the ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of [his] reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

B.     **Analysis under the Social Security Act**

To qualify for disability insurance benefits, a claimant must be "disabled" under

the Act.  A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months."  42. U.S.C. § 423(d)(1)(A).  The ALJ must consider the following five-step evaluation to determine whether the claimant is disabled: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy."  *Dixon*, 270 F.3d at 1176.  The claimant has the burden of establishing a disability at steps one through four, and at step five the burden shifts to the Commissioner.  *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

ALJ Marceille applied this five-step analysis.  At step one, he determined that Sopko has not engaged in substantial gainful activity since the alleged onset date of September 11, 2009.  (R. 26.)  At step two, the ALJ concluded that Sopko suffers from the following severe impairments: "status post cerebrovascular accident; atrial septal aneurysm; syncope episodes; hypertension; major depressive disorder; panic disorder; and borderline intellectual functioning."  (*Id.*)

At step three, the ALJ concluded that Sopko does not have an impairment or a combination of impairments, either mental or physical, that meets or medically equals one of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 27-28.)  Next, the ALJ determined that Sopko has the RFC to perform sedentary work as defined in 20 C.F.R. 404.1567(a), except that she requires a cane for walking.  (R. 28-32.)  The ALJ

17

further concluded that Sopko can continually use her hands; can occasionally balance, stoop, kneel, crouch, crawl, and reach overhead with her right hand; cannot drive or climb ladders, ropes, or scaffolds; and must avoid exposure to hazards such as unprotected heights, dangerous moving machinery, and extreme temperatures.  (*Id.*) The ALJ concluded that Sopko can have occasional interaction with others and can perform simple, routine, repetitive work in a job that involves only occasional decision-making and workplace changes.  (*Id.*)

At step four, the ALJ concluded that Sopko could not perform her past work based on the exertional demands of the bartender and retail sales manager positions. (R. 32.)  The ALJ then concluded that because the claimant was 47 years old at the time of the alleged disability onset date, September 11, 2009, she was classified as a younger individual (ages 45-49), pursuant to 20 C.F.R. § 404.1563.  (*Id.*)  At step five, the ALJ found that given claimant's age, education, work experience, and RFC, which included a sedentary level of exertion with additional restrictions, claimant could perform a significant number of jobs in the economy in the category of bench hand assembly. (R. 33.)  Based on this finding, the ALJ concluded that claimant was not disabled under the Act and denied her application for DIB.  (*Id.*)

Sopko now raises a number of issues with the ALJ's decision, arguing (1) that the ALJ did not adequately consider certain medical evidence regarding her mental impairments and limitations on her hand function; (2) that the ALJ erred in assessing the opinion of her treating physician; (3) that the ALJ misrepresented the testimony of the VE; and (4) that the ALJ erred by not considering the claimant's borderline age situation in his disability determination.  We address each of these arguments in turn below.

18

**C.     The ALJ Properly Considered Claimant's Mental Impairments and Hand Function Limitations.**

Sopko argues that the ALJ did not properly consider certain medical records related to her hand function and the effects of her anxiety and mental impairments, resulting in an improper RFC determination. We disagree.

The RFC is the maximum a claimant can still do despite her limitations. 20 C.F.R. § 404.1545(a)(1). With respect to the RFC assessment, the ALJ must consider all of the relevant evidence in the case record, including information about symptoms that may or may not be shown by objective medical evidence alone. 20 C.F.R. § 404.1545(a)(3); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *5. "[W]henever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." SSR 96-7p, 1996 WL 374186, at *2. The ALJ's decision will be upheld "so long as the evidence supports it and the ALJ explains her analysis of that evidence with enough detail and clarity to permit meaningful appellate review." *Eichstadt v. Astrue*, 534 F.3d 663, 665-66 (7th Cir. 2008) (quotation omitted). Furthermore, the ALJ is not required to rely only on one particular physician's opinion for his determination. *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007).

Here, Sopko argues that the ALJ did not sufficiently consider the medical evidence from Dr. Michael Gelbort regarding her hand function. On November 16, 2009, Dr. Gelbort reported that the claimant's motor speed and dexterity were

borderline deficient on her left side.  (R. 355.)  Though the ALJ did not explicitly mention this finding, his opinion makes clear that he reviewed Dr. Gelbort's report.  Further, as the ALJ noted, state agency physician Dr. Rafiq reported just a few weeks later that the claimant's "grip strength was normal in her right hand and mildly reduced in her left, but she was able to grasp and manipulate objects without difficulty."  (R. 29, 364.)  Thus, the ALJ did not ignore an entire line of evidence on this issue and we find no reversible error in the ALJ's failure to mention Dr. Gelbort's finding with respect to claimant's left hand function.  *See Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010) ("The ALJ need not, however, discuss every piece of evidence in the record and is prohibited only from ignoring an entire line of evidence that supports a finding of disability.").

In addition, contrary to Sopko's assertion, the ALJ properly reviewed Dr. Gelbort's report, along with the other evidence in the record regarding claimant's mental impairments and deficient IQ, when assessing whether she met a Listing and in determining her RFC.  His decision to limit Sopko to only occasional interaction with others, and to simple, routine, and repetitive work, with only occasional decision-making and workplace changes is supported by substantial evidence.

Lastly, Sopko's argument that the ALJ erred by failing to consider her prior period of disability because her symptoms are now "significantly worse" is without merit.  As the Commissioner points out, "any determination made under this section shall be made on the basis of the weight of the evidence and on a neutral basis with regard to the individual's condition, without any initial inference as to the presence or absence of disability being drawn from the fact that the individual has previously been determined to be disabled."  42 U.S.C. § 423(f).

### D.     The ALJ Properly Assessed the Opinion of Claimant's Treating Physician.

Next, Sopko argues that the ALJ failed to afford proper weight to the opinion of her treating physician Dr. Schubert.[5]  Again, we disagree.

Generally, the ALJ will give the opinion of a treating physician controlling weight because treating physicians are "most able to provide a detailed, longitudinal picture" of the claimant's medical condition.  20 C.F.R. § 404.1527(c)(2).  However, a treating physician's opinion concerning the nature and severity of a claimant's condition receives controlling weight only when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with substantial evidence in the record.  *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008).  "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion" to determine what amount of weight to afford the opinion.  *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (*citing* 20 C.F.R. § 404.1527(c)(2)).

The ALJ must always give "good reasons" for his determination as to the amount of weight afforded a treating physician.  20 C.F.R. § 404.1527(c)(2).  Nonetheless, the Seventh Circuit has held that an ALJ's decision to discount a physician's opinion is subject to a very deferential, or "lax," standard of review.  *Elder v. Astrue*, 529 F.3d 408,

_____

[5] Also in this section of her brief, claimant takes issue with the ALJ's treatment of the opinions of Dr. Faukner and Dr. Rafiq.  These arguments are without sufficient explanation and are baseless.

415 (7th Cir. 2008). As long as the ALJ "minimally articulated" his reasoning, a reviewing court must allow that decision to stand. *Id.* It is also well settled that a physician's opinion that an individual is disabled is not entitled to any special significance because such a conclusion is reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(d)(1); *Dixon*, 270 F.3d at 1177 ("[A] claimant is not entitled to disability benefits simply because her physician states that she is 'disabled' or unable to work.").

As discussed above, the record in this matter includes letters from Dr. Schubert expressing his opinion regarding Sopko's condition. (R. 427-28, 430, 471, 473.) In those letters, Dr. Schubert briefly describes Sopko's ailments and states that she is permanently disabled and has been unable to work since September 2009. The ALJ rejected these "extreme opinions," concluding that Dr. Schubert's own treatment notes do not support his opinions, nor do they document that he provided significant treatment for claimant's alleged disabling conditions. (R. 32.) Elsewhere in his decision, the ALJ recognized that Dr. Schubert had not referred Sopko to a rheumatologist or physical therapist despite her claims of debilitating fibromyalgia pain. (R. 31.) The ALJ's reasoning here satisfies the "lax" standard of review we afford an ALJ's decision to discount a treating physician's opinion.

### E. The ALJ Erred By Failing to Address Claimant's Proximity to the Next Age Category.

The claimant's next argument relates to her age and the Commissioner's Medical-Vocational Guidelines, or "Grids." At the time of the hearing, and when the ALJ's decision that was issued shortly thereafter, Sopko was approximately six months

away from her fiftieth birthday. Under the guidance of the Grids, once an individual reaches age 50, she is classified as a person "closely approaching advanced age" (ages 50-54). 20 CFR § 404.1563(d). Here, however, based on Sopko's chronological age at the alleged onset of disability date (47), the ALJ classified her as a younger individual (ages 45-49). 20 CFR § 404.1563(c). And, using Medical-Vocational Rule 201.21 as a guideline, along with the testimony of the vocational expert, found her not disabled. Sopko now argues that the ALJ should have addressed her proximity to the next age category in this "borderline" situation. On this point, we agree.

The Grids, which are used as a guide to direct a finding of disability or non-disability at step 5, take into account certain combinations of age, education, work experience, and exertional limitations. 20 C.F.R. § 404.1569. Generally, "age" refers to the claimant's chronological age, and the Grids use the age categories such as those discussed above. 20 C.F.R. § 404.1563(a). However, the Social Security Administration will not apply the age categories mechanically in a borderline situation. Indeed, the regulations provide: "If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all other factors in your case." 20 C.F.R. § 404.1563(b). The Social Security Administration's Hearing, Appeals, and Litigation Law Manual ("HALLEX") provides further guidance to ALJs in handling borderline cases, explaining that such a situation may arise when "the age category changes within a few months after the alleged onset date, the date last insured, or the date of the ALJ's decision." HALLEX II-5-3-2.

23

In this case, there is no evidence that the ALJ even recognized claimant's proximity to the next age group. As claimant argues, had he done so, and had he determined that Sopko was more appropriately classified in the "closely approaching advanced age" category, the Grids may have directed a finding of disabled.[6]

As an initial matter, we reject the Commissioner's assertion that this case does not involve a borderline situation. Where, as here, claimant was approximately six months away from the next age category at the time of the ALJ's hearing and decision, case law dictates that a borderline situation may in fact exist. *See Smith v. Barnhart*, No. 00 C 2643, 2002 WL 126107, at *3 (N.D. Ill. Jan. 31, 2002) ("[T]he cases tend to treat the claimants who are within six months of 50 years old as presenting borderline cases."); *Freundt v. Massanari*, No. 00 C 4456, 2001 WL 1356146, at *19 (N.D. Ill. Nov. 2, 2001) (recognizing that 6 months and 12 days may constitute a borderline situation).

Further, although there is a Circuit split as to how an ALJ must address a borderline age situation, the Seventh Circuit has not yet specifically weighed in. *See Figueroa v. Astrue*, 848 F. Supp. 2d 894 (N.D. Ill. 2012) (thoroughly reviewing Circuit split). Nonetheless, like many other district courts in this Circuit, we conclude that the ALJ's failure to acknowledge whether he considered claimant's borderline age situation or otherwise explain his age category determination requires remand. *See Figueroa*, 848 F. Supp. 2d at 902; *Anderson v. Astrue*, No. 09 C 2399, 2011 WL 2416265, at *14 (N.D. Ill. June 13, 2011); *Christoffel v. Colvin*, No. 12 C 148, 2013 WL 4788095, at *5

---

[6] We cannot be certain which Medical-Vocational Rule might have applied had the ALJ classified Sopko as closely approaching advanced age because the ALJ did not reach a conclusion regarding the transferability of her skills. (R. 33.)

(N.D. Ind. Sept. 9, 2013); *Freundt,* 2001 WL 1356146, at *20. On remand, the ALJ need not automatically re-classify claimant as a person "closely approaching advanced age," but must consider whether re-classification is appropriate and provide a sufficient explanation of his reasoning.[7]

### III. Conclusion

For the foregoing reasons, the claimant's motion for summary judgment [13] is granted to the extent she seeks a remand on the borderline age issue discussed above. The Commissioner's motion for summary judgment [19] is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion. It is so ordered.

**ENTERED:**

_____
**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: October 3, 2013**

---

[7] Given this finding, and recognizing that our decision to remand will require further consideration at step five, we need not address Sopko's assertion that the ALJ misrepresented the VE's testimony. We note, however, that had we not found reversible error in the ALJ's handling of the borderline age situation, the ALJ's misstatement regarding the representative nature of the "bench hand assembler" position would amount to harmless error.